## THE PORTSMOUTH SAVINGS BANK v. THE VILLAGE OF ASHLEY.

*Municipal bonds—Good-faith holder—Unauthorized delivery.*

1. The statute of this State, in reference to the issuance of water-
   works bonds, vests that power in the village council, and until
   that body has met at a legal meeting, and voted to issue the
   bonds, or authorized their issuance, one of the essential
   requirements of the statute has not been compiled with.

2. A resolution of the village council authorizing the president
   and clerk to sign waterworks bonds confers no authority upon
   those officers to issue and dispose of the bonds, and if issued
   and disposed of without such authority they are not binding
   on the village.

3. A purchaser of waterworks bonds is bound to take notice of the
   statute under which they are issued, and of the records of the
   council of the village issuing them; and where nothing
   appears upon the records except a resolution authorizing the

president and clerk of the village to sign the bonds, such purchaser is chargeable with notice of the want of authority of those officers to issue and dispose of the bonds.

Error to Gratiot. (Daboll, J.) Argued April 20, 1892. Decided May 20, 1892.

*Assumpsit.* Plaintiff brings error. Affirmed. The facts are stated in the opinion.

*George P. Stone,* for appellant, contended:

1. The defendant, having designedly by its public record, and by the face of its bonds, caused it to appear that the bonds were executed December 1, 1886, by its proper officers, and having by such means obtained the money of the plaintiff, is now estopped from asserting to the contrary; citing *Gibbs v. School-district,* 88 Mich. 334; *Port Huron v. McCall,* 46 Id. 565.

2. Gibson was acting as clerk at the request of the village president, and had possession of its seal, and was an officer *de facto,* and as such his acts would bind the defendant; citing *Auditors v. Benoit,* 20 Mich. 176; *Keator v. People,* 32 Id. 484; but the execution of bonds by an officer after the expiration of his term of office does not invalidate them; citing *Weyauwega v. Ayling,* 99 U. S. 112.

*A. W. Scott,* of counsel for appellant, contended:

1. The rights of a *bona fide* holder of municipal bonds, which have been unlawfully issued and negotiated, pass by transfer of the bonds, even to one having full knowledge of such illegality; citing *Verbeck v. Scott,* 71 Wis. 59; *Bank v. Boston,* 149 Mass. 364.

2. The substitution of bonds in place of others which have been lawfully issued, where the amount of liability is not increased thereby, is not sufficient to support an action against a *bona fide* holder for their cancellation; citing *Solon v. Bank,* 114 N. Y. 122.

3. The purchaser of municipal bonds who acts in good faith and pays value is entitled to the protection of such recitals of fact as the bonds may contain; citing *Lake Co. v. Graham,* 130 U. S. 674; *Lewis v. Comanche Co.,* 35 Fed. Rep. 343.

4. That city bonds were in fact issued and delivered before the ordinance authorizing the issuance thereof took effect will not invalidate them in the hands of a purchaser, and their pay-

ment will not be enjoined at the suit of a tax-payer; citing *Electric Co. v. Newton*, 42 Fed. Rep. 723.

5. The purchaser of negotiable bonds in good faith for value is unaffected by want of title in the vendor, and is presumed to act in good faith. He acquires a good title, although the bonds were stolen from their true owner by his vendor; citing *Carpenter v. Rommel*, 5 Phila. 34; *Spooner v. Holmes*, 102 Mass. 503; *State v. Wells*, 15 Cal. 336; *Texas v. White*, 7 Wall. 700; *Murray v. Lardner*, 2 Wall. 110.

6. Recitals in county bonds are conclusive, constituting an estoppel *in pais* upon the county which issued them; citing *Moran v. Miami Co.*, 2 Black, 722; and if the legal authority under which the public agents acted is sufficiently comprehensive, a party taking the bonds has a right to presume that those empowered to act and acting under it have complied with its requirements; citing *Meyer v. Muscatine*, 1 Wall. 384.

7. Where municipal bonds are in the hands of a *bona fide* holder, and the recitals are to the effect that the same are lawfully issued, mere irregularities cannot be taken advantage of in suits thereon against the municipality; citing *Knox Co. v. Aspinwall*, 21 How. 539; *Moran v. Miami Co.*, 2 Black, 722; *Supervisors v. Schenck*, 5 Wall. 772; *Gelpcke v. Dubuque*, 1 Id. 175; *St. Joseph Tp. v. Rogers*, 16 Id. 644; *Pendleton Co. v. Amy*, 13 Id. 297; *Coloma v. Eaves*, 92 U. S. 484; *Randolph Co. v. Post*, 93 Id. 502; *Johnson Co. v. Thayer*, 94 Id. 631.

*T. W. Whitney* and *Wisner & Draper*, for defendant.

*Kelly S. Searl*, of counsel for defendant, contended:

1. The papers signed by the president and clerk were not bonds of the village of Ashley at the time they were signed, and the *signing* did not make them such without an authorized issuance and delivery; citing *Coler v. Cleburne*, 131 U. S. 162; 1 Pars. N. & B. 114; Daniel, Neg. Inst. §§ 840-842; Rand. Com. Pap. § 1893; *Ledwich v. McKim*, 53 N. Y. 315; *Redlich v. Doll*, 54 Id. 234; *Bank v. Bergen Co.*, 115 U. S. 384; *McGarrahan v. Mining Co.*, 96 Id. 316; *Burson v. Huntington*, 21 Mich, 415; *Cressinger v. Dessenburg*, 42 Id. 580; *Hall v. Wilson*, 16 Barb. 548; *Chipman v. Tucker*, 38 Wis. 43; *Roberts v. McGrath*, Id. 52; *Roberts v. Wood*, Id. 60; *Walker v. Ebert*, 29 Id. 194.

LONG, J. This is an action brought to recover the amount of interest due upon a series of municipal coupon bonds, alleged to have been executed and issued by the

defendant.   The suit was commenced by declaration, in
which were set forth copies of the bonds and coupons
upon which recovery is sought.   Under the plea of the
general issue the defendant gave notice that it would
show on the trial that, if said bonds and coupons were
signed and sealed by the defendant's lawful agents, they
were so signed and sealed collusively and fraudulently
by said agents and one Robinson, a representative agent
of the Toledo, Saginaw. & Muskegon Railway Company;
and that the defendant would insist that said bonds and
coupons were never, by authority of any vote of the
constituted authorities of said defendant, delivered or
transferred to any person upon valid, valuable, or good
consideration, but that the said bonds and coupons were
delivered without warrant or authority to the aforesaid
agent of said railway company by the fraud and collusion
of defendant's agents and said Robinson.

The defendant, after the issue made as aforesaid, and
after one trial had been had, and on March 21, 1890, by
permission of this Court (83 Mich. 646) filed an affidavit
in the cause, denying under oath the execution of the
bonds and coupons in suit.

The cause was tried before the court without a jury,
and the court made the following findings of fact and
law:

"*First.* That on the 18th day of November, 1886, a committee of
the common council of the village of Ashley reported to the coun-
cil that the probable cost of waterworks would be about $9,000;
that on the 18th day of November, 1886, a resolution was passed by
the common council, calling a special meeting of the legal, qual-
ified voters of the village, to be held on the 29th day of Novem-
ber, 1886, at the depot in the village, for the purpose of voting
upon the question of bonding the village to the amount of $8,500
for waterworks.   The resolution recited that the said bonds should
be issued as follows:  Seventeen bonds, of $500 each, payable, first
bond January 1, 1892, and one bond annually thereafter, with
interest at six per cent. annually on the whole amount unpaid.
   91 MICH.—43.

The said resolution further directed the clerk to give notice of the time and place for the registration of voters as provided by statute. The notice of such special election was given by the clerk of the village by posting notices of the same, showing the purpose for which it was called, in three public places in said village. Said notices were so posted on the 18th day of November, 1886.

"*Second.* That, pursuant to said notice, a special election was held on the 29th day of November, 1886, and at such meeting the question of bonding the village for waterworks, as set forth in the notice for the same, was voted on, and resulted in seventy-two votes for the proposition and one against.

"*Third.* That afterwards the common council passed a resolution that the president and clerk sign up the bonds so authorized.

"*Fourth.* No other authority was given, and there is no record that there was any one authorized to dispose of the bonds to any person. While the ostensible purpose of this action was to build a system of waterworks, it was understood by the village council, and generally by the people of the village, that the real object was to give the bonds to the railroad company that was then proposing to build a road from Muskegon to Ashley as a bonus for building the road. But there is nothing in the public records of the village which discloses that the bonds were issued for any other purpose excepting for waterworks.

"*Fifth.* That, pursuant to the said action of the council, a set of bonds aggregating the sum of $8,500 (in accordance with the vote and action of the council) were prepared, there being seventeen of the bonds, of $500 each, a copy of which is as follows:

"'No.---- $500.
"STATE OF MICHIGAN.
"'Village of Ashley, County of Gratiot.

"'The village of Ashley, in the county of Gratiot and State of Michigan, hereby acknowledges itself indebted in the sum of $500, lawful money of the United States of America, bearing interest at the rate of six per cent. per annum from the date hereof, payable annually, and said sum of money the said village of Ashley promises to pay to the holder thereof on the ------ day of ------, A. D. 18—, the interest aforesaid to be paid annually, according to the interest coupons hereto attached, and both principal and interest payable at the treasurer's office of the village of Ashley.

"'This bond is issued in pursuance of the statutes of the State of Michigan and a resolution of the trustees of the village of Ashley, and was authorized by a legal vote of the qualified voters of said village, at a meeting held November 29, A. D. 1886.

"'In testimony whereof, we, the undersigned officers of the village, being authorized to execute this obligation in its behalf, have hereunto set our signatures this first day of December, A. D. 1886. "'------ ------, President. "'------ ------, Clerk.'

"*Sixth.* That, in pursuance and by virtue of the authority granted by the common council or board of trustees, the president and clerk proceeded to sign the full number and amount of said bonds (17), and they were then by the president, in pursuance of the understanding hereinbefore mentioned, sent to a bank at Toledo, Ohio, and there deposited to the order of the said president of the village, his understanding being that the said bonds should be turned over to the said railroad company whenever the same was completed to the said village of Ashley.

"*Seventh.* That after the bonds were so deposited the president of the said railroad made efforts to negotiate the same, but, claiming that, owing to the cheap appearance of the bonds, and the fact that they were payable at the treasurer's office of the village, his efforts were unsuccessful, thereupon he procured a new set of bonds to be prepared, and sent or personally delivered them to the president of the village, with a request that they be signed and substituted for the first set; and thereupon the president of the village, and one O. E. Gibson, who was the village clerk at the time the first set of bonds were executed, but whose term of office had then expired, and who had removed from the village of Ashley, and whose successor had been elected and duly qualified, executed the new set of bonds, without the direction or knowledge of the village council.

"*Eighth.* That, after the bonds were so executed, the president of the village took them, and on the following day, which was March 28, 1887 (they having been signed and sealed on Sunday), left them with the express company in Ashley, to be sent to the Toledo Trust & Loan Company, of Toledo, Ohio, there to be held subject to the order of the village; it being the understanding of the village president that the bonds were to be delivered to the railroad president upon the completion of said railroad to Ashley.

"*Ninth.* Said bonds were in the possession of Robinson, the president of the railroad, on March 30, 1887; but there is no evidence as to how they came to his possession, nor is there any evidence showing what was done with the bonds by the express company after they were delivered to it at Ashley.

"*Tenth.* That the railroad had not been completed to the village of Ashley, aforesaid, at the time the said railroad president procured the second set of bonds.

"*Eleventh.* No action was ever taken by the village council or trustees authorizing the execution of the latter set of bonds, and the same was done by a secret agreement between the said Robinson and the president of the village acting as above stated, and without the knowledge of the village council.

"*Twelfth.* At the time the said second set of bonds were so

executed, the first set of bonds were still in existence, and still in said bank, subject to the order of the president of the said village; but were deposited there for the purpose and with the intent heretofore stated.

"*Thirteenth.* After the second set of bonds had been signed and had come into Robinson's hands, as above stated, the president of the village had the bonds first issued returned to the village of Ashley, and they were taken by him and one of the trustees, and secretly burned. The bonds were procured and destroyed by the president, as above stated, after April 1, 1887. The following are copies of bond No. 1 and coupon No. 1 of the series upon which this suit is brought, and the balance of the bonds and coupons in suit are in the same words and figures as those here shown, excepting as to the numbers of the same and the dates and times of payment.

"'No. 1.                                                            $500.00.
"'THE UNITED STATES OF AMERICA.
"'State of Michigan, County of Gratiot, Village of Ashley.
"'Waterworks Bond.

"'*Know all men by these presents,* that the village of Ashley, Gratiot county, State of Michigan, is indebted to and promises to pay to the bearer the sum of five hundred dollars in lawful money of the United States of America at the Wayne County Savings Bank, in the city of Detroit, Michigan, on the first day of January, A. D. 1892, with interest thereon at the rate of six per cent. per annum, payable annually on the first day of January of each year upon the presentation and delivery of the proper coupon hereto annexed, signed by the president and clerk of said village, at said Wayne County Savings Bank in the city of Detroit; for the payment of which sum and interest the said village is hereby held and firmly bound, and its faith and credit are hereby pledged.

"'This bond is one of seventeen bonds, amounting in the aggregate to eight thousand five hundred dollars, issued by the village of Ashley, Michigan, for the purpose of building waterworks under authority conferred by the laws of the State of Michigan, and was duly authorized by a majority of the legal voters of said village at an election held November 29, 1886. And it is hereby certified and recited that all acts, conditions, and things required to be done precedent to and in the issuing of said bonds have been properly done, happened, and performed in regular and due form as required by law.

"'In testimony whereof, we, the undersigned officers of the village of Ashley, being duly authorized to execute this obligation on its behalf, have hereunto set our signatures, and caused the seal of said village to be hereunto affixed, this first day of December, 1886.

"'WM. A. CHITTENDEN, President.
"'O. E. GIBSON, Clerk.'

[Seal.]

"'Coupon No. 1.                                                   $30.00.
"'January 1, 1888, the village of Ashley, county of Gratiot, and

State of Michigan, will pay to the bearer thirty dollars at the Wayne County Savings Bank, in Detroit, Michigan, being the interest due that day on bond No. 1, issued December 1, 1886.

" 'WM. A. CHITTENDEN, President.

" 'O. E. GIBSON, Clerk.'

"*Fourteenth.* That the plaintiff is the *bona fide* owner and holder of said bonds, having purchased the same in the open market, in good faith, for value, without notice of the object and purpose of their issue, or of the acts of the officers of the village, except as is shown by the public records of said village and the recitals on the face of the bonds.

"*Fifteenth.* That at the time of the commencement of this suit there was due and unpaid on said bonds the sum of $510, with interest thereon at six per cent. per annum from January 1, 1888.

"*Sixteenth.* I find, as conclusions of law, that the said bonds were issued without authority of law.

"*Sixteenth* (a). I find that no person or officer was ever authorized to sign or issue the bonds upon which this action is based.

"*Sixteenth* (b). I find that the president of the village had no authority to deliver, or in any manner dispose of, either the first or second set of bonds.

"*Seventeenth.* I find that the officers, at the time they signed the same, were acting without the authority of the village, and without authority of law, and that the said bonds are absolutely void, and that the plaintiff cannot recover.

"Judgment for the defendant is hereby ordered.

"S. B. DABOLL, Circuit Judge."

Judgment was rendered upon said findings in favor of defendant on September 2, 1891.

After these findings were filed in the cause, plaintiff's counsel requested the court to find further, as follows:

"1. That the name of O. E. Gibson was put upon the bonds in question because it was deemed necessary that the names should appear as they were on the first set, and that they should correspond with the officers' names as they were at the time the first set were made.

"2. That at the time the bonds in suit were made, signed, and sealed, the said O. E. Gibson had possession of the seal of said village, and was acting as clerk of said village, at the request of the village officers·"

The plaintiff also excepted specifically to certain of the findings made as follows:

"1. To so much of the seventh finding of the court as

finds that at the time the bonds in suit were executed the successor of O. E. Gibson had been elected and duly qualified, and that said bonds were executed without the direction or knowledge of the village council, as not being supported by the testimony.

"2. To so much of the eighth finding of the court as finds that the bonds in suit were left with the express company in Ashley, to be sent to the Toledo Trust & Loan Company, as not being supported by the testimony.

"3. To the finding of the court that the said bonds were issued without authority of law.

"4. To the finding of the court that no person or officer was ever authorized to sign or issue the bonds on which this action is brought.

"5. To the finding of the court that the president of the village had no authority to deliver or in any manner dispose of either the first or second set of bonds.

"6. To the finding of the court that the officers, at the time they signed the same, were acting without the authority of the village, and without authority of law, and that the said bonds are absolutely void."

The requests for further findings and the exceptions to the findings made constitute the claimed errors, which have been fully argued in this Court.

The several exceptions taken to the refusal of the court below to make other and additional findings of fact and law, and the exceptions to the seventh and eighth findings made by the court, need not be considered, as we think the plaintiff's case must stand or fall upon one question, and that is whether the president of the village had authority to deliver the bonds in controversy, or the right in any manner to dispose of them.

The findings made by the court below are supported by the testimony returned, that, while the ostensible purpose of issuing these bonds by the village was to build a system of waterworks, yet it was understood by the people of the village and its officers that the real object was to give the bonds as a bonus to the railroad company that was then purposing to build a road from

Muskegon to Ashley. This was well understood by the village officers to be unlawful, and that bonds so issued would be void upon their face. The effort was made by the people of the village and the officers in the call for the election by which the bonds were to be voted, and in the prcoeedings by the village trustees, to cover up the real purpose for the issuing of the bonds, and the records from beginning to end disclose a lawful purpose for which they were to be issued,—that is, the construction of the waterworks,—so that parties purchasing would have no means of ascertaining from the records the real object of the issue. These first bonds recited that they were made payable at the treasurer's office of the village of Ashley, and that they were issued in pursuance of the statutes of the State of Michigan and a resolution of the trustees of the village of Ashley, and were authorized by the legal vote of the qualified voters of said village, at a meeting held November 29, 1886. The first issue was destroyed by the president of the village, but by whose authority does not appear. Mr. Chittenden was president, and in his testimony says that the bonds were destroyed and new ones issued for the reason that the first set was made payable at the office of the village treasurer, and they could be better disposed of if made payable at a bank, and that the second issue was made payable at the Wayne County Savings Bank in the city of Detroit. . The second issue of the bonds was signed by the president and clerk of the village some time in March, 1887, after the term of office of the village clerk had expired, and his successor had been elected. The bonds were dated back to the date of the first issue, but contained different recitals than the other bonds, both as to place of payment, and the fact that all acts and things necessary to be done had been done and performed as required by law. These second bonds, upon their face,

were regular, and, if the recitals were true, were of valid issue; but there is nothing upon this second set to show that the president and clerk of the village ever had authority to sign them, or to deliver any of them for any purpose whatever.

The village records were put in evidence, from which it appears that a resolution was passed December 1, 1886, as follows:

"*Resolved* by the common council of the village of Ashley, now in session, that the president and clerk be authorized to sign the bonds of the village for waterworks; said bonds those voted for by the councilmen at the meeting held November 18, 1886, also by the legal voters at the special election held November 29, 1886."

This is the last resolution passed by the council in reference to these bonds; and it nowhere appears from the records of the village that any authority was ever conferred upon the president and clerk to deliver the bonds to any person, or for any purpose whatever, or to issue new bonds in place of those destroyed. The mere signing of the bonds did not bind the village to the payment of them. They were still incomplete, and remained in the hands of the village subject to the direction and control of the council. The village council was the only power, under the statutes, which had authority to direct the issue or delivery for the purposes for which the bonds were executed. No direction whatever was given by it to deliver the bonds, and, until authority was given by the council, the president had no more power to dispose of them than a stranger to the proceedings; and a disposition of them by the president would not confer upon the holder any greater right to enforce payment than though they were stolen from the village treasury. The public can act only through authorized agents, and it is not bound until all who are required to participate in

what is to be done have performed their respective duties.
*Brown v. Bon Homme Co.* (S. Dak.), 46 N. W. Rep. 173.

In *Burson v. Huntington,* 21 Mich. 415, this Court laid
down the doctrine that there can be no such thing as an
innocent purchaser of negotiable paper which never had
an inception by delivery. It was said:

"As a general rule, a negotiable promissory note, like
any other written contract, has no legal inception or
valid existence as such until it has been delivered in
accordance with the purpose and intent of the parties."

The supreme court of Wisconsin followed the above
rule in the case of *Chipman v. Tucker,* 38 Wis. 43, and
it was there said, citing from Chief Justice Dixon,
in *Walker v. Ebert,* 29 Wis. 197:

"The inquiry in such cases goes back of all questions of
negotiability, or of the transfer of the supposed paper
to a purchaser for value, before maturity, and without
notice. It challenges the origin or existence of the paper
itself, and the proposition is to show that it is not in
law or in fact what it purports to be, namely, the
promissory note of the supposed maker. For the purpose
of setting on foot or pursuing this inquiry, it is imma-
terial that the supposed instrument is negotiable in form,
or that it may have passed to the hands of a *bona fide*
holder for value. Negotiability in such cases presupposes
the existence of the instrument as having been made by
the party whose name is subscribed, for until it has
been so made, and has such actual legal existence, it is
absurd to talk about a negotiation, or transfer, or *bona
fide* holder of it, within the meaning of the law
merchant."

The statute of this State, in reference to the issuing
of the waterworks bonds, vests that power in the village
council, and until that body has met at a legal meeting,
and voted to issue the bonds, or authorized their issue,
one of the essential requirements of the statute has not
been complied with; and these bonds, being issued with-
out such direction, are not binding against the village.

The plaintiff, in its purchase of these bonds, was bound to take notice of the statute and of the records of the village of Ashley relating to the matter, and, had the plaintiff examined the records of the council, it would have been advised that the president and clerk of the village had no authority whatever to deliver the bonds to the loan and trust company at Toledo, Ohio, as the extent of the resolution of the council was a direction to the president and clerk to sign the bonds which had been voted at the special election held November 29, 1886.

The judgment of the court below must be affirmed, with costs.

MCGRATH, GRANT, and MONTGOMERY, JJ., concurred. MORSE, C. J., did not sit.