## NATIONAL BANK OF COMMERCE v. OKLAHOMA CITY.

No. 1670. Opinion Filed March 19, 1912.

(122 Pac. 644.)

1. **MUNICIPAL CORPORATIONS—Negligence—Delivery of Duplicate Certificates.** The allegation that by gross negligence of city officers duplicate certificates were issued and placed on the market is not sustained by proof that they were never delivered by any one having authority to deliver them, but that they were taken without right by one having no authority to deliver them.

2. **SAME—Stolen Tax Certificates—Rights of Purchaser—Liability of City.** A mayor and city clerk, by an oversight, signed duplicate paving tax certificates in favor of the contractor. An employee in one of the city offices stole the duplicates, and he, or some one in collusion, forged the indorsement of the contractor and delivered them to plaintiff as collateral for a loan. Plaintiff

made no investigation as to whether the certificates had been delivered, or as to the genuineness of the indorsement. The loan was not paid. In a suit by plaintiff against the city for negligence of its officers in signing the duplicates, held:

(1) That plaintiff was negligent in accepting the certificates without making investigation as to whether they had been regularly issued.

(2) That the fact that duplicate certificates were signed was not the proximate cause of the bank's loss. The proximate cause was the tortious acts of the city employee.

(Syllabus by Rosser, C.)

*Error from District Court, Oklahoma County;*
*Geo. W. Clark, Judge.*

Action by the National Bank of Commerce against Oklahoma City. Judgment for defendant, and plaintiff brings error. Affirmed.

*Devereux & Hildreth,* for plaintiff in error.

Opinion by ROSSER, C.   In 1903 Oklahoma City entered into a contract with the Barber Asphalt Paving Company, by which that company was to do certain curbing and paving on Harvey avenue in the city of Oklahoma City. The contract was lawful and entered into in pursuance of a valid ordinance of the city. The company did the work in compliance with its contract. As compensation for its work, there were issued to the company certificates, in which the cost of the work was assessed and charged against the tracts of land liable therefor. These certificates were issued in large numbers, and the mayor and clerk of the city signed and sealed them without checking them up. Duplicate numbers from 145 to 160, both inclusive, having a face value of $2,026.01, were signed. A man named Roundtree was working in some of the city offices of Oklahoma City, though the evidence does not show in what office he was working. He wrote to the plaintiff, National Bank of Commerce, at Guthrie, and inquired if the bank would lend a friend of his $1,200 on certain paving certificates. The plaintiff replied it would make the loan, and asked him to forward copies of the original ordinance, under which the paving certificates were issued, and also

a blank of the form used in the certificates. He did that, and the note was prepared at the bank and mailed to him. It was returned to the bank, signed by C. E. Biller, and what purported to be sixteen paving certificates, numbered from 145 to 160, inclusive, were inclosed with the note as collateral security for its payment. The bank then sent Roundtree a draft for $50 and the balance of the amount to Biller. The paving certificates purported to be indorsed by the Barber Asphalt Paving Company, by E. B. Demarest, attorney in fact, and were also indorsed by C. E. Biller. The indorsement of the Barber Asphalt Paving Company was a forgery, and the certificates inclosed were never issued or delivered by the city, but were duplicates of the certificates issued to the Barber Asphalt Paving Company. The bank did not correspond with any of the officials of Oklahoma City, or with any one else, except Roundtree, with reference to the certificates. It appears that Roundtree has absconded. There is some doubt whether such a person as Biller ever existed. If so, he was never produced.

When the first installment came due, the certificates were presented by the bank and the first installment paid. When the second installment came due, the Barber Asphalt Paving Company produced the valid certificates and collected the amount, and the city refused to make further payment to the plaintiff upon the certificates held by it.

The defendant filed a demurrer to the original petition, and the court took the demurrer under advisement from March, 1906, until November 15, 1907. On the last-mentioned date, the demurrer was overruled. The plaintiff contends that when the demurrer was overruled the law, as decided upon the demurrer, became the law of the case, and that the finding of law upon the demurrer could not be questioned during the further progress of the case, except by appeal. It further contends that every material allegation in the petition was proven by the testimony, and that therefore its right to recover was fixed by the overruling of the demurrer. It contends, further, that, the demurrer having been overruled November 15, 1907, all questions adjudi-

cated in the demurrer became *res judicata* upon the expiration of one year after the demurrer was sustained, and that the order overruling the demurrer could not be appealed from after the expiration of one year.

The evidence did not prove all the material allegations of the petition. The petition, after alleging, in substance, the facts as stated above, and after alleging the issuance of valid certificates, alleges:

"That by the gross negligence and carelessness of the defendant corporation and of the defendants Van Winkle and Blaise duplicate certificates for the numbers hereinafter set out were issued by said city, and were placed on the market."

The proof showed that the city did not issue the certificates. So far as the proof went, it tended to show that the certificates were fraudulently abstracted from the offices of the city and transferred to the plaintiff by forged indorsements. There is no proof whatever that the city issued the certificates; but, on the other hand, all the evidence shows that it did not do so.

The city is not liable. The tax certificates were not negotiable instruments. It is admitted that the city is not liable upon the certificates; but it is claimed that it is liable for the negligent act of its officers, by which Biller or Roundtree, or whoever committed the fraud, was enabled to defraud the bank. It is claimed that the mayor and city clerk were negligent in signing the certificates. The only act of negligence that can be charged against the mayor and clerk is that they did something which permitted a dishonest man to perpetrate a wrong. If the officials of the city had all been honest—in other words, if Roundtree had been honest—there would have been no danger in signing the certificates. But it is claimed here that because those certificates were duplicates of valid certificates the city would be responsible, because the mayor and clerk did not investigate to see whether they were signing duplicate certificates. The face of the certificate covers almost two printed pages, and it appears that there were 160 of them. To have read each certificate, and compared each of the 160, would have been quite a task. Of course, the numbering might have been observed; but the mere numbering

of the certificate was a matter which, of all others, would most likely be left to a subordinate employee. If, in issuing certificates of this sort, it is necessary for the mayor or chief official to check over the numbers, and to attend to such mere clerical matters, then it will not be safe for cities to employ clerical help at all; such help would be practically valueless.

In relying upon Roundtree's honesty, the city did no more than the plaintiff itself did in lending him the money upon the faith of the certificates. In the case of *Fuller v. Mower,* 81 Me. 380, 17 Atl. 312, where a town order was signed in blank by a selectman and delivered to the chairman of the board of selectmen, to be used for legitimate purposes, the chairman issued it to the plaintiff, who loaned to him certain money, relying upon his assurance that the town was in need of money to pay debts, and that the board had authority to borrow the money. The town had not authorized the borrowing of the money, and suit was brought against the selectman who had signed the order. It was held that he was not liable. In the course of the opinion, the court said:

"It is urged that the defendant was careless in signing a blank order and leaving it with Skinner. Perhaps he was. It can now be seen that it was dangerous to do so. But the defendant was not more careless in trusting Skinner with a blank order than the plaintiff was in trusting him with money, when no other member of the board was present to witness or sanction the transaction. And in this particular they are *in pari delicto.* And if it be true, as counsel urge, that Skinner's fraud would not have been possible but for the defendant's negligence, it is equally true that the fraud would not have been possible but for the plaintiff's negligence. Both trusted him, and both were deceived by him."

In *Savings Bank v. Village of Ashley,* 91 Mich. 670, 51 N. W. 74, 30 Am. St. Rep. 511, the village council authorized the president and clerk to sign certain bonds, but did not authorize them to deliver them. The bonds were delivered to a railroad company, which sold them to a *bona fide* purchaser. It was held that the purchaser could not recover. The court said:

"The mere signing of bonds did not bind the village to the payment of them. They were still incomplete and remained in the hands of the village, subject to the direction and control of the council. The village council was the only power, under the statutes, which had authority to direct the issue or delivery for the purposes for which the bonds were executed. No direction whatever was given by it to deliver the bonds, and, until authority was given by the council, the president· had no more power to dispose of them than a stranger to the proceedings; and a disposition of them by the president would not confer upon the holder any greater right to enforce payment than though they were stolen from the village treasury."

In *Gould v. Wise*, 97 Cal. 532, 32 Pac. 576, 33 Pac. 323, the grantee in a deed took the deed from the table where it was lying while a purchase-money mortgage was being prepared, carried it out of the room, and executed a mortgage on the land to an innocent third person, and then returned and signed the note and mortgage for the purchase money. The court held that permitting him to take the deed out of the room was not such negligence as estopped the grantor from asserting his mortgage in preference to that of the innocent third person.

In the case at bar, the bank had no more right to trust Roundtree than did the city. Though the instrument was not negotiable, the bank made no effort to ascertain how it came into Biller's hands, made no effort to ascertain who Biller was, and relied entirely upon Roundtree to ascertain whether or not the certificates were genuine.

In *Merchants' Bank v. Bergen County*, 115 U. S. 384, 6 Sup. Ct. 88, 29 L. Ed. 430, the court, speaking by Mr. Justice Fields, said:

"This is not a case where there existed in the board a general power to issue negotiable securities of the county, so that parties would be justified in taking them when properly executed in form by its officers. It is a case where there was no power, except as specially delegated by law for a particular purpose. All persons taking securities of municipalities having only such special power must see to it that the conditions prescribed for the exercise of the power existed. As an essential

preliminary to protection as a *bona fide* holder, authority to issue them must appear."

In *Anthony v. County of Jasper,* 101 U. S. 693, 25 L. Ed. 1005, which was an action to recover upon certain bonds issued to a township in the state of Missouri, the court said:

"In order to recover in this case, it became necessary for the plaintiff to prove that the bonds from which the coupons sued on were cut had been executed according to law. He did prove that they were signed by the presiding justice and clerk of the court, and were sealed with the seal of the court. This, before the act of March 30, 1872, would have been enough; but after that more was necessary. The public can act only through its authorized agents; and it is not bound until all who are to participate in what is to be done have performed their respective duties. The authority of a public agent depends upon the law as it is when he acts. He has only such powers as are specifically granted; and he cannot bind his principal under powers that have been taken away by simply antedating his contracts. Under such circumstances, a false date is equivalent to a false signature; and the public, in the absence of any ratification of its own, is no more estopped by one than it would be by the other. After the power of an agent of a private person has been revoked, he cannot bind his principal by simply dating back what he does. A retiring partner, after due notice of dissolution, cannot charge his firm for the payment of a negotiable promissory note, even in the hands of an innocent holder, by giving it a date within the period of the existence of the partnership. Antedating, under such circumstances, partakes of the character of a forgery, and is always open to inquiry, no matter who relies on it. The question is one of authority of him who attempts to bind another. Every person who deals with or through an agent assumes all the risks of a lack of authority in the agent to do what he does."

In *Terry v. Allis,* 20 Wis. 35, the first paragraph of the syllabus is as follows:

"Where a city order has never been delivered to or indorsed by the payee, no one can acquire such a title to it as will enable him to collect its amount of the city."

It must not be forgotten that the certificates were not obligations of the city. They were tax certificates creating a lien

on certain lots for paving tax, and were payable by the lot owners.

The distinction between liability upon the certificates and liability for negligence in signing them has not been overlooked. The term "negligence," in this connection, though commonly used, is probably inaccurate. It seems to be more a question of estoppel. If the question were one of negligence, it would be easy of solution. "In order to render a person liable for negligence, it must be shown that the damage was the ordinary or probable consequence of the act." It will not do to reverse the ordinary presumption that people are honest, and say that the ordinary or probable consequence of signing too many certificates is that some one will steal them and place them in circulation. See *Burson v. Huntington,* 21 Mich. 436, 4 Am. Rep. 497. Besides, the act of signing was not the proximate cause of the bank's loss. The proximate cause was the theft of Roundtree, which was not necessarily connected with the signing of the certificates. The signing of the duplicates, at most, was only a condition and not a cause of plaintiff's loss. The principle here involved is discussed in *O'Herron v. Gray,* 168 Mass. 573, 47 N. E. 429, 40 L. R. A. 498, 60 Am. St. Rep. 411. Among other things, it is said:

"If the negligence is such as might be an appropriate foundation for an action at law to recover damages by one who advances his money, it may be availed of by way of estoppel, to avoid circuity of action. But the facts of this case fall short of showing such negligence. The guardian intrusted the certificates to a national bank of good reputation. Neither she nor anybody else had any reason to anticipate the larceny or embezzlement of the property, and a fraudulent use of it, to deceive others, by a trusted officer of the bank. She had no reason to expect that, if the certificates were stolen, anybody would take them without inquiring whether, as trust property, they had been disposed of by the guardian for the benefit of her wards. The conduct of the guardian was not a cause but a mere condition of the defendant's advance of money upon the faith of the certificates. A criminal act of Francis intervened as a cause of the defendant's loss; and this the guardian had no reason to anticipate."

The cases cited by plaintiff are not in point. In all the cases cited, the securities on which recovery was had were *actually delivered by the person authorized to deliver them*. In this case, the certificates were never delivered. They were stolen.

The principle that when one of two innocent persons must suffer by the act of a third he who first trusted must first suffer does not apply. The city did not trust Roundtree any further than it did any other employee. It in no way clothed him with evidence of ownership. The fact that the certificates were issued in duplicate possibly made it easier to perpetrate the fraud. At least, it probably prevented the fraud from being discovered as soon as if there had been only one set of certificates. It may be that the opportunity to perpetrate the fraud may have tempted Roundtree to attempt it; but the *bona fide* purchaser from the thief, who entered by an unlocked door, cannot defend against the owner because of his negligence in leaving the door unlocked. Roundtree could have stolen valid certificates and defrauded the bank in the same way.

It is not necessary to enter into the questions arising out of the fact that the instruments, out of which this cause of action arises, were special tax certificates upon which, if genuine, the city would not be liable, and out of the distinctions that might be urged as existing between the liability of a public and private corporation under the same circumstances.

The judgment of the lower court should be affirmed.

By the Court: It is so ordered.